Spear,' J.
The issue in this case is narrowed by the pleadings to a small compass, though the argument has taken a wide range. We think the case may be determined by the application of simple and well-settled rules of law.
By its answer, the company denied that the deposits of slack and refuse were made or permitted, with the purpose of having them washed down on to plaintiff’s lands, and denied negligence, but did not deny that it made the deposits and permitted them to remain at the places in the petition charged, nor that they were deposited in such manner as that they would be, and were, carried away by the streams. In the view of the trial court, therefore, there was practically but one question for the jury to pass upon in determining the liability of the company, in case damage were proved as the result of the defendant’s acts, and plaintiff’s own acts did not prevent a recovery, and that was whether or not, in making and continuing the deposits, the company’s managers knew, or ought as reasonable men to have known, that they would be washed down by the streams and thus injure the plaintiff.
It is fundamental, we presume, that an owner of land has the right to enjoy the soil itself, in its natural state, unaffected by the tortious acts of a neighboring land owner, and, where the land is located along the margin of a stream, he is, as a riparian owner, entitled, as an incident to his estate, to the natural flow of the water of the stream, in its accustomed channel, undiminished in quantity and unimpaired in quality, *58 except where his estate is servient to one which dominates it, and except as to injury which may be done to it by one in the performance of an act lawful in itself and done in a manner which does not involve malice or negligence. Wash-burn’s Easements and Servitudes, 4th ed., p. 316 ; Johnson v. Jordan, 2 Met. 234. This was the position of plaintiff as to his land on Monday creek, and as to the waters of that stream.
It is not claimed that the plaintiff’s land is, in any legal sense, servient to that of the coal company. But, broadly stated, the claim of the company is, that being a corporation authorized to mine coal in the state, and owning the lands upon and in which its mines are situate, and conducting a business which is of great importance to the public as tending to develop the natural resources of the country, it has the right to place its slack and refuse upon the sufface of its own land at such points as is necessary for its convenience in the carrying on of its current and future mining operations, and that, if it makes such deposits carefully, without malice, but solely with a view to the reasonable and successful mining of its coal, this is no more than is warranted by the common usage of other coal companies and operators of the Hocking valley and that section of the state, and is but a lawful and proper use of its own lands; and although the slack and refuse so deposited, in the ordinary course of things, may, when placed there, be expected to wash down and finally reach the lands of the plaintiff, to his damage, yet it is damnum absque injuria, and there can be no recovery.
Of course the right of the coal company, as a land owner, to the natural and full use of its soil, is measured by the same rule as that applied to the like right of the plaintiff. But the right it insists upon is something different from the natural and ordinary use of the soil. While not an unusual one, perhaps, with those engaged in the same business in the locality, it is an exceptional rather than a common and ordinary one. It is not incidental to the use of the soil itself, as such; indeed, is destructive of what is the most common use of the soil, viz.: for agricultural purposes. Yet it is not, *59 necessarily, an improper or unlawful use. Whether it is so, or not, depends upon the circumstances. The course of business is to take the coal in a body from the inside of the mines to the surface, there screen it, and dump the slack and refuse on its own land, but in such places, that, owing to the conformation of the ground, it maybe carried down the tributaries, and into Monday creek. If the company may lawfully do this, even though the probable and natural effect, known to the company’s managers at the time, is, that the deposits will wash down on to and injure the plaintiff’s lands, or pollute the water of Monday creek, then there can be no recovery, and the judgments below should be reversed.
That the coal company is a corporation can make no difference in the case. Its rights are just as great, and no greater than those of a private person in the same business. That it is authorized by its charter to mine coal generally in the state cannot enlarge its rights in any particular locality. Even had its charter empowered it to establish a business and carry it on in a particular place, it cannot be presumed that the state has intended to authorize it to carry on the business in a manner destructive of the property rights of others without compensation. While the thing to be done may be lawful in a general way, there are and must be limitations upon the means by which it is to be done. Nor is it of consequence that the operation of the company’s mines tends to the development of the natural resources of the country. But few enterprises, the product of which is useful, fail to advance the general good. Along with many evils attending the working of this class of organizations, valuable services have been rendered to the public by them, and many comforts and necessaries are afforded the people by them which the capital of single individuals would be inadequate to produce. At the same time they are not, in the eye of the law, public enterprises, but, on the contrary, are organized and maintained wholly and entirely for private gain; and so soon as gain ceases to follow their operation, just as soon do the operations themselves cease.
Equally immaterial, as we think, is the matter of custom *60 among coal operators in the Hocking Valley and the surrounding mining districts near thereto, of depositing slack and refuse on their own lands, when such custom is invoked to justify deposits so placed as to naturally allow them to wash down to the injury of lands lying below them. The rights of the plaintiff to the uninterrupted use of his land, and the unimpaired use of the water of Monday creek being secured to him by the common law, how is it possible that a custom can deprive him of them? Why should a usage, the-effect of which, if recognized, is to permit one man to take from another his property rights without compensation, be-' sanctioned? If it be assumed that the custom is a general one, then it is part of the common law itself, and there would be presented an instance of two rules of law, equally binding, and yet wholly inconsistent the one with the other. If it be claimed that the custom is a particular one, then we have the anomaly of a land owner’s common law right in his land taken from him by a usage of a particular trade, established by strangers, which it is not pre tented he has ever been cognizant of, much less assented to. To have affected the plaintiff, the custom must have been shown to be reasonable and certain, known to him, or to have been so general and well ■ established that knowledge would be presumed, peaceably acquiesced in, and not unjust, oppressive, or in conflict with an established rule of public policy. The alleged custom possessed scarcely one of these attributes. Even though it had been common throughout the state, it would not avail. A usage which is not according to law, though universal, cannot be set up to control the law. Meyer v. Dresser, 111 E. C. L. R. 646; Stoever v. Whitman, 6 Binn. 416; Inglebright v. Hammond, 19 Ohio, 337. Nor could the testimony offered avail the defendant on the ques- ’ tion of negligence. Evidence of a particular custom is sometimes admitted to explain a contract; to ascertain the intention of the parties when it has not been fully expressed in the contract, to interpret the otherwise indeterminate intentions and acts of the parties, or to show that the mode in which a contract has been performed is the one customarily *61 followed by others engaged in the same calling or trade. But, as a general proposition, one “ charged with negligence will not be allowed to show that the act complained of was customary among those engaged in a similar occupation, or those placed under like circumstances or OAving similar duties. Such an offer is in effect to shoAV, as an excuse for defendant’s negligence, a custom of others to be equally negligent.” Deering’s Law of Negligence, § 9; Cleveland v. Steamboat Co., 5 Hun 523; Judd v. Fargo, 107 Mass. 264; Hinckley v. Barnstable, 109 Mass. 126; Miller v. Pendleton, 8 Gray, 547; Bailey v. N. H. Co., 107 Mass. 496; Littleton v. Richardson, 32 N. H. 59; Bridge Co. v. Fisk, 23 N. H. 171; Crocker v. Schureman, 7 Mo. App. 358. That others engaged in like business have been accustomed to disregard the rights of their neighbors can furnish no justification to the defendant to do so.
The further claim of the company that it had the right to make the deposits in the places complained of because it Avas necessary to the successful conduct of its own buisness to so place them, seems no less wanting in substance. The effect ■is to measure the rights of the plaintiff, in his lands, and in the waters of Monday creek, by the convenience or necessity of the company’s business. An owner of land in Ohio is not subject to any such narroAV and arbitrary rule. If the injury complained of were merely a fanciful wrong, or produced simply personal discomfort, such as any dweller in a town is necessarily subjected to by reason of the operations of trade which may be there carried on, and which are actually necessary, not only, for the enjoyment of property, but for the benefit of the inhabitants of the town and the public at large, there might be no real ground of complaint; but where the result of the acts of one on his own land is a direct and material injury to the property and property rights of another, a very different question arises, and, in such case the maxim sic utere tuo ut alienum non laedas applies. Upon reason, we think the proposition sound, that where no right by prescription exists to carry on a particular business in a particular manner, at a particular place, and the natural and necessary result of the place *62 selected, and the manner adopted, is to cause material injury to the property rights of another, it is not a sufficient defense to an action for damages to show that the locality where it is carried on is one generally in use by persons in such business, and the manner in which it is carried on is commonly adopted by others in such business, even though it appear that the use made of the land, while not the common and ordinary use of land as such, is not an unnatural nor improper one in and of itself, nor even an unusual one, and the proposition will be found sustained by abundant authority. From the scores of cases we are content to cite Tipping v. Smelting Co., 116 E. C. L. R. 608, 615, and same case, 11 H. of L. Cases, 642; Bamford v. Turnley, 113 E. C. L. R. 61. In the hitter case defendant was the owner of land on which was clay well adapted to the making of brick. He dug the clay, moulded it, and proceeded to burn it on the land, to the damage of the plaintiff. The court held that an action for a nuisance would lie. Attention is 'specially called to the opinion of B bamwiEll, B. Attention is also called to Sherman & Redfield on Negligence, sections 733, 734. “It is a general principle that any person who, without authority, diverts the whole or ai^r part of the water of a stream from its natural course, or interferes with its natural current, is responsible absolutely, and without any question of negligence, to any one who is entitled to have the water flow in its natural state.” “ Any use of the land near a stream, or of the water of the stream itself, which renders the water un wholesome, offensive, Or unfit for the purposes for which it is used, is unlawful; and any riparian owner who is damaged by such unlawful acts has an action for his damages against the author of the wrong.”
If this view of the law be correct it is clear that the question as to the company’s liability, in case damages were proved as the result of the defendant’s acts, and the plaintiff’s own conduct did not prevent a recovery, was, as held by the trial court, merely a question whether or not, in making and continuing the deposits the company’s managers knew, or ought to have known as reasonable men, that the deposits *63 would be washed down by the stream, and might injure the plaintiff. No obstacle was placed by the court to the making of proof by the company touching this point. The offer of proof in regard to negligence did not embrace this idea, however, and was, therefore, too general to be of service to the jury. Besides this, it embraced propositions as to matters wholly immaterial, as heretofore shown. It was not error, therefore, to exclude the testimony. For like reasons there was not error in refusing to charge as requested. Some of the propositions embraced correct principles of law in the abstract, but were not, as stated, wholly applicable to the case made, and might have been misleading, inasmuch as they were in the line of the defendant’s theory of the case, which, we think, was wrong. Nor was there error in the charge as given. The rule given the jury as to negligence was in strict consonance with the doctrine laid down by this court in Crawford v. Rambo, 44 Ohio St. 279. It is there held that “ Where a riparian owner constructs an embankment upon his own lands, that occasions substantial injury to the lands of a neighbor upon the stream, and which might, at the time, have been anticipated by a man of ordinary prudence and intelligence, he is liable in damages for the injury as occasioned.” The rule, we think, applies to the case at bar.
The case of Ruffner v. Railroad, 34 Ohio St. 96, is cited as sustaining the company’s claim. With due respect we think it fails to do so. The question was, whether, where a railroad company, authorized to propel its trains and operate its road by steam locomotives, an inference of negligence arises from the mere fact that an injury to adjoining property was caused by sparks emitted by such locomotives, which question the court answered in the negative. The railroad company was authorized by the state to construct its railroad and operate it by locomotives, and the only way by which it was possible for the locomotives to be driven was by the creation of steam by means of fire, and sparks would necessarily follow. It was not only the natural and common way, but the only practical way. Negligence must be shown; it *64 will not be presumed. Hence, when the only fact present was that sparks had been emitted from the smoke stack which caused damage, the court would not infer that the fire was carelessly conducted, nor that the appliances of the railroad company were defective.
But whether or not, at common law, the action could be maintained, there seems to be no question but that the acts charged against the defendant company, if done intentionally, constituted a nuisance punishable by the criminal statute, and ■ that a right of action on the part of a person injured would follow. By the act of April 15, 1857, 1 S. & C. 880, “the obstructing or impeding, without legal authority, the passage of any navigable river, harbor, or collection of water; or the corrupting or rendering unwholesome or impure any water course, stream or water; or unlawfully diverting any such water course from its natural course or state, to the injury or prejudice of ■ others,” was declared a nuisance, made punishable by fine, and a right of action given to any person injured for civil damages. The act of March 27, 1876, 78 Ohio L. 87, provided “ That if any person or persons shall intentionally throw or deposit, or permit to be thrown or deposited, any coal dirt, coal slack, coal screenings, or coal or other refuse from coal mines, into or upon any of the rivers, lakes, ponds, streams, or any place adjacent to the same, from which such • coal dirt .... will wash into any of the rivers, lakes, ponds or streams of this state, every such person or persons shall be , deemed guilty of a misdemeanor, and upon conviction thereof shall be fined,” etc., “and shall moreover be liable to the • party or parties injured in treble the amount of damages by him, her, or them sustained.” This act was codified the fol- , lowing j'-ear and made part of the penal code, 74 Ohio L. 264, under the head of “Nuisances,” and is section 7 of that ehap- . ter. In this codification, which is now in substance, section ,6925 of the Revised Statutes, the provision for treble dam- , ages is omitted. It does not. follow, however, that civil damages may not be recovered. The acts charged in this case against the company came within the statutory definition of nuisances. This legislation shows a legislative intent *65 to give the injured party a civil action. But, aside from this, it is settled law, we presume, that for injuries arising from a nuisance the' injured party may have an action. Judge Cooley, in his work on Torts, 2d ed., p. 790, says: “itis sufficient to say of the authorities that they recognize the rule as a general one, that when the duty imposed by statute is manifestly intended for the protection and benefit of individuals, the common law, when an individual is injured by a breach of the duty, will supply a remedy if the statute gives none.” See, also, cases cited, and Cardington v. Fredericks, 46 Ohio St. 442.
If, therefore, the evidence showed that the statute had been intentionally violated, a statutory nuisance was shown to have been committed, and those engaged in producing it would be liable. Let it be assumed that the company,-on account of its artificial character, could not be indicted and punished, yet the persons in its employ who did the acts could be held both criminally and civilly, and whenever the acts of an employee are such as to make him liable personally, the employer, whether a natural person or a corporation, may be held civilly where it. is shown that the acts of the employee were performed in the line of his duty. So that, in this ease, if the acts done would have rendered the employees amenable to the criminal statute, no rule of law forbids the reaching beyond them and visiting responsibility in civil damages upon the corporation itself. Its liability will be measured by the same rules of law which determine the liability of the employees. Applying this test we suppose the rule to be well settled that persons of intelligence are presumed to have intended the natural consequence of their deliberate acts. If, therefore, the natural result of placing slack and refuse in the stream, or on the margin or bank, is that they will be washed down by heavy rains on to the lands of plaintiff, and this would be apparent to the ordinary observer, it is but just to assume, in the absence of a contrary showing, that the expectation was that it should so wash. And this state of facts would show that the company exercised its right negligently. But if such washing was *66 not a natural consequence, and would not have been anticipated, as a natural result, by persons of usual intelligence, in the exercise of ordinary care, no intent would be presumed, nor negligence imputed, and if damage ensued to persons having property on the streams below, by the washing of slack, etc., no liability would attach to those who made the deposits. And, in substance, the foregoing was given by the trial judge to the jury.
The charge upon other questions presented is an accurate statement of the law of the case. An examination of the record fails to show any error therein.
Bradbury, J., not sitting.

Judgment affirmed.